IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| MELISSA P. MARTIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:23-cv-01076 (RDA/IDD) |
| | ) |
| STATESIDE ASSOCIATES, INC. | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Stateside Associates, Inc.'s ("Defendant") Partial Motion to Dismiss (Dkt. 40) (the "Motion").[1] This Court has dispensed with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). These matters have been fully briefed and are now ripe for disposition. Considering the Motion together with Defendant's Memorandum in Support (Dkt. 41), Plaintiff's Opposition (Dkt. 43), and Defendant's Reply (Dkt. 44), this Court GRANTS Defendant Stateside Associates, Inc.'s Motion for the reasons that follow.

---

[1] Plaintiff appears to have filed her original complaint *pro se*, although she was assisted by an attorney. *See* Dkt. 1. Before service of her complaint, however, Plaintiff retained her current counsel. Dkt. 4 (seeking extension of time to serve the complaint because counsel was retained "late evening on November 14, 2023"). Subsequently, counsel has filed all docket entries on her behalf.

1

## I.  BACKGROUND

### A.  Factual Background[2]

Plaintiff Melissa P. Martin was born in 1980. Dkt. 38 ¶ 3. On March 21, 2007, Plaintiff began her employment with Defendant as a Regulatory Counsel. *Id.* ¶ 13. In Summer 2019, Plaintiff was promoted to "Senior Director, Healthcare and Education Team" (the "Healthcare Team") and received a 16% increase in her salary. *Id.* ¶ 14. Her new immediate supervisor was Robert Holden, one of Defendant's three Senior Principals. *Id.* ¶ 15.

In late 2019 and continuing into 2020, Holden began to seek Plaintiff's termination. *Id.* ¶ 16. Holden directed staffers not to work directly with Plaintiff and the Healthcare Team because it "would complicate matters." *Id.* In Winter 2020, Holden's subordinate, Zach Cook (who is male and 30 years of age), directed members of Holden's staff to check the Healthcare Team's work for "errors." *Id.* Plaintiff alleges that Holden's staff were not qualified to perform such review and that younger male managers were not subject to similar review. *Id.* ¶ 17.

Plaintiff alleges that Holden, Cook, and other managers made unspecified demeaning remarks about female managers and staff. *Id.* ¶ 18. Plaintiff asserts that Cook derided Plaintiff's divorced status and her academic credentials. *Id.* Plaintiff alleges that Cook and the other unidentified male managers received multiple promotions that were denied to female staffers and that there was a "brutally toxic environment toward Plaintiff and other female staffers." *Id.*

Plaintiff repeatedly informed Holden and another Senior Principal, Mark Anderson, that the Healthcare Team was understaffed, but her concerns were ignored. *Id.* ¶ 19. The staffing problem grew exponentially after Defendant was engaged by Humana Corporation to perform

---

[2] For purposes of considering the instant Motion, the Court accepts all facts contained within the Second Amended Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

2

healthcare-related regulatory and legislative work. *Id.* ¶ 20. In March 2020, Humana's demands increased dramatically with the onset of the COVID-19 pandemic. *Id.* ¶ 21. The Healthcare Team was overwhelmed. *Id.* ¶ 22.

Holden regularly lashed out at Plaintiff over operational matters related to the Healthcare Team. *Id.* ¶ 23. During these outbursts, Holden would scream and slam his fists onto office furniture. *Id.* Holden's outbursts were directed at Plaintiff and other female staffers, but not younger male staffers. *Id.* These interactions affected Plaintiff's mental and physical health. *Id.* ¶ 24. In 2020, Plaintiff sought treatment with a mental health provider. *Id.*

On August 12, 2020, Plaintiff lodged a complaint with Defendant about Holden and the "abusive work environment that he was creating." *Id.* ¶ 25. In an August 20, 2020 meeting with Anderson, Plaintiff described the work environment in the Healthcare Team, as well as Holden's behavior. *Id.* ¶ 26. In response, Anderson initiated an investigation to be conducted by Meredith Campbell, Esq. *Id.* ¶ 27.

On August 27, 2020, Plaintiff met with Campbell and described the abusive work environment stemming from "Holden's threatening behavior directed at her and other female staffers." *Id.* ¶ 28. Campbell assured Plaintiff that her interview would be confidential. *Id.*

On September 18, 2020, Plaintiff provided a signed statement regarding her interview with Campbell. *Id.* ¶ 29. Two months passed without any noticeable action, and, on October 20, 2020, Plaintiff sent Anderson an email informing him that she wanted to reach out to him about the issues she had raised with him. *Id.* ¶ 31. Anderson then agreed to meet with Plaintiff. *Id.*

On October 21, 2020, Anderson delivered "an ultimatum" to Plaintiff indicating that she could: (i) continue to work on the Healthcare Team as managed by Holden; or (ii) be moved off the Healthcare Team and be supervised by Anderson on special projects, which circumstances

3

would not provide any supervisory authority. *Id.* ¶ 32. Anderson did not provide any further details about the proposed new position or special projects, but he did explain that Plaintiff would not have a team. *Id.* ¶ 33.

On October 30, 2020, Plaintiff informed Anderson that she would accept the new position. *Id.* ¶ 34. Anderson told Plaintiff that her new title would be "Senior Director and Counsel, Policy Research." *Id.*

Cook succeeded Plaintiff on the Healthcare Team, despite having no regulatory experience. *Id.* ¶ 35.

Anderson did not provide Plaintiff with specific guidance regarding the special projects on which she was to work. *Id.* ¶ 36. On November 30, 2020, Plaintiff sent Anderson an email informing him of her handover to Cook and seeking direction regarding her new job duties. *Id.* ¶ 37. Anderson responded that same day with a list of projects that "we can transfer to you now." *Id.*

On December 10, 2020, Anderson gave Plaintiff a list of performance goals for 2021 on special projects. *Id.* ¶ 38. On December 11, 2020, Anderson "excoriated" Plaintiff after she asked questions regarding a COVID-related project and accused her of erecting obstacles. *Id.* ¶ 39.

Plaintiff received a bonus for her job performance in 2020. *Id.* ¶ 40.

In a January 7, 2021 email, Anderson faulted Plaintiff for not following her job description and told her, "if you do not have time to do your job, or if you need me to help you prioritize, let me know." *Id.* ¶ 41. Anderson later continued to "badger" Plaintiff about not meeting Defendant's performance expectations. *Id.* ¶ 42.

After accepting her new role on October 30, 2020, Plaintiff continued to be required to receive assignments from and report to Holden. *Id.* ¶ 43. Anderson and Holden assigned multiple

healthcare-related special projects to Plaintiff. *Id.* ¶ 44. These projects required Plaintiff to once again interact with Holden several times a week, causing her emotional distress and interfering with her ability to do her job. *Id.* ¶ 46.

Plaintiff informed Holden that she faced immediate deadlines for a competing project, to which Holden insisted that his projects took priority. *Id.* ¶ 44. Plaintiff informed Anderson of the conflicting deadlines in her communication that precipitated his January 7, 2021, response.[3] *Id.* ¶ 45.

After Plaintiff's transfer, Anderson refused to supervise or direct Plaintiff's work. *Id.* ¶ 47. Whenever Plaintiff sought guidance or provided updates on her assigned project, Anderson would respond in a hostile and toxic manner. *Id.* He explained that he had no time to supervise Plaintiff. *Id.* This led to Plaintiff being "whip-sawed between projects with competing deadlines." *Id.*

In March 2021, Plaintiff expressed additional concerns about discrimination, harassment, and retaliation to Stephanie Reich, a Vice President. *Id.* ¶ 48. Plaintiff then met with Campbell and reiterated the same. *Id.* Plaintiff met with Campbell for a third time on March 16, 2021. *Id.* ¶ 49. Although Plaintiff provided Campbell with the names of other employees who could corroborate Plaintiff's claims, Plaintiff alleges that Campbell did not interview them. *Id.* ¶ 50.

Plaintiff alleges that principals and coworkers shunned Plaintiff and that she was given little productive work to perform. *Id.* ¶ 51.

---

[3] Plaintiff alleges in paragraph 41 of her Second Amended Complaint that Anderson's January 7, 2021 email stemmed from his "faulting her for not following an unwritten job description." Dkt. 38 ¶ 41. In paragraph 45, though, Plaintiff alleges that this email came in reply to informing Anderson of the conflicting deadlines. *Id.* ¶ 45. Because Plaintiff cites the same response from Anderson with regards to either context, this Court treats these allegations as a single criticism from Anderson.

In Spring 2021, Plaintiff's mental health provider suggested that she resign from her employment with Defendant. *Id.* ¶ 53. On April 6, 2021, Plaintiff heeded that advice and resigned from the company, effective April 20, 2021. *Id.* ¶ 54. Plaintiff informed Defendant that, in her view, her resignation was involuntary, and that she was being constructively discharged. *Id.*

On May 27, 2021, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC"). *Id.* ¶ 6. On May 17, 2023, the EEOC issued a right to Sue Letter. *Id.* ¶ 7.

## B. Procedural Background

On August 15, 2023, Plaintiff filed her Complaint *pro se*. Dkt. 1. On November 15, 2023, current counsel first appeared on behalf of Plaintiff. Dkt. 3. After the appearance of counsel, Plaintiff sought and was granted extra time in which to serve her Complaint. Dkt. 6. After serving Defendant, Plaintiff then sought leave to amend her Complaint. Dkts. 9–11. On March 4, 2024, leave was granted, and Plaintiff filed her Amended Complaint. Dkts. 17–18.

On March 18, 2024, Defendant filed a Motion to Dismiss which sought to dismiss Counts IV–VIII of the Amended Complaint. Dkts. 20–21. Defendant also filed an Answer with affirmative defenses. Dkt. 23. After receiving additional time to respond to the motion, Plaintiff filed her Opposition Brief on April 5, 2024, stipulating to the dismissal of Counts IV–VI as well as Counts VII–VIII insofar as they relied on claims of age-based discrimination. Dkt. 27. Defendant then filed its Reply. Dkt. 28.

After the Motion was fully briefed, Plaintiff moved for leave to file a second amended complaint. Dkt. 29. Defendant moved to strike. Dkt. 31. Plaintiff then withdrew her motion. Dkt. 32. On May 8, 2024, Plaintiff filed a notice of supplemental authority. Dkts. 33–34. On May 16, 2024, Defendant filed a response. Dkt. 35.

On January 15, 2025, the Court issued a Memorandum Opinion and Order granting Defendant's Motion to Dismiss. Dkt. 36. The Court dismissed Counts IV–VI and Count VII to the extent that it relied on age discrimination pursuant to Plaintiff's stipulation and Count VIII was dismissed for failure to state a claim. Dkt. 36.

With leave of the Court, Plaintiff filed a Second Amended Complaint on January 29, 2025. Dkt. 38. On February 12, 2025, Defendant filed a Motion to Dismiss Count V of the Second Amended Complaint, which alleges constructive discharge. Dkt. 40. Defendant also filed an Answer with affirmative defenses. Dkt. 39. Plaintiff filed an Opposition on February 26, 2025. Dkt. 43. Defendant filed its Reply on March 4, 2025. Dkt. 44.

## II. STANDARD OF REVIEW

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleaded factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). When reviewing a motion brought under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). "[T]he court 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)). Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*,

7

556 U.S. at 678. Generally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion. *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

## III. ANALYSIS

Plaintiff's Second Amended Complaint asserts five causes of action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq* ("Title VII"), but the only count at issue here is Count V, which asserts that Plaintiff was constructively discharged. For the reasons set forth below, the Court will grant the Motion to Dismiss.

A plaintiff may establish a constructive discharge by showing that her employer "made [her] working conditions intolerable in an effort to induce [her] to quit." *Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006). But, as the Fourth Circuit has noted, "mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Id.* In assessing whether a work environment is intolerable, the Fourth Circuit has instructed that a reviewing court must assess "whether a 'reasonable person' in the employee's position would have felt *compelled* to resign, . . . that is, whether [s]he would have had *no choice* but to resign." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 212 (4th Cir. 2019) (emphasis in original). As judges within this District have recognized, "constructive discharge claims are held to a high standard, and even truly awful working conditions may not rise to the level of constructive discharge." *Lindsay-Felton v. FQSR, LLC*, 352 F. Supp. 3d 597, 606 (E.D. Va. 2018).

Despite the Court's prior Memorandum Opinion noting the difference between a sex-based and a retaliation-based constructive discharge claim, Plaintiff still fails to assert the basis for Count V. Dkt. 38 ¶ 105; Dkt. 36 at 8. Thus, the Court – as it did previously – will address both potential

8

bases for a constructive discharge claim. Plaintiff fails to allege sufficient facts to plausibly allege constructive discharge under either theory; thus, the Motion will be granted, and Count V will be dismissed.

## A.     Discriminatory Constructive Discharge

To the extent that Plaintiff attempts to assert a discriminatory constructive discharge claim, such a claim is premised on Plaintiff's allegations of a sex-based hostile work environment. The Court previously determined that Plaintiff's claim failed under this theory because Plaintiff had been transferred to a position under Anderson and because Plaintiff had failed to allege that Anderson had any sex-based bias. Dkt. 36 at 8. Seeking to address this deficit, Plaintiff amended her allegations to emphasize that, even after Anderson became her supervisor, Defendant required her to continue interacting with her alleged harasser, Holden. *Id.* ¶¶ 43–46. The Court acknowledges that Plaintiff attempted to address some of the faults identified in her previous complaint, but Plaintiff's argument is unavailing because, regardless, Plaintiff fails to allege plausible facts to demonstrate that her working conditions were intolerable.

As an initial matter, Plaintiff proffers no factual allegations plausibly indicating gender-bias by Holden. Attempting to establish Holden's gender-bias, Plaintiff alleges that he directed demeaning remarks towards Plaintiff, empowering Cook to "derid[e] [her] divorced status and her academic credentials." Dkt. 38 ¶ 18. These alleged insults are not unambiguously gender-biased, however, and though Plaintiff alleges that male staffers did not receive the same treatment, neither does she allege that those male staffers were divorced or had similar credentials. *See Hartsell v. Duplex Prods., Inc.*, 123 F. 3d 766, 772 (4th Cir. 1997) ("An insulting or demeaning remark does not create a federal cause of action for sexual harassment merely because the 'victim' of the remark happens to belong to a class protected by Title VII."). Beyond these insults, Plaintiff's allegation

9

that Holden and other managers made demeaning remarks is too vague and conclusory to support her claim of constructive discharge. *See Okebata v. Dep't of Defense*, 2022 WL 3754201, at *5 (E.D. Va. July 29, 2022) (holding "vague assertions about harassment and bullying . . . do not suffice to state a claim"); *Steele v. Blinken*, 2022 WL 11964563, at *6 (E.D. Va. Oct. 19, 2022) (dismissing claim where plaintiff failed "to plead at least modest details that would allow the Court to assess the frequency and severity of allegedly harassing conduct"). Holden's extra supervision of Plaintiff, his loud "tirades," and the understaffing of the Healthcare Team in light of the pandemic, while undoubtedly unpleasant, are insufficient to *compel* a reasonable person to resign. *See Williams v. Giant Food, Inc.*, 370 F.3d 423, 434 (4th Cir. 2004) (stating allegations that supervisors yelled at and chastised plaintiff were insufficient to establish intolerable working conditions).

Plaintiff's allegations regarding her interactions with Holden after her transfer are likewise not sufficient to demonstrate an intolerable environment. Plaintiff alleges that when she told Holden that she had competing deadlines that "Holden insisted that his projects take priority." Dkt. 38 ¶ 44. Instead of establishing intolerability, this behavior is more representative of "difficult or unpleasant working conditions [that] are not so intolerable as to compel a reasonable person to resign." *Williams v. Giant Food, Inc.*, 370 F.3d 423, 434 (4th Cir. 2004) (citing *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994)). Indeed, these allegations appear to demonstrate that her interactions and difficulties with Holden in this regard were expressly related to the prioritization of work, do not appear related to any sex-based animus, and are not an outrageous ask by a supervisor. As the Fourth Circuit has repeatedly emphasized, Title VII's purpose is not to establish the courts as a "super-personnel department weighing the prudence of employment decisions." *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 206 (4th Cir. 2016). Thus, Plaintiff's allegations,

10

taken as a whole, are insufficient so as to be construed that Plaintiff had no choice but to resign. *Evans v. Int'l. Paper Co.* 936 F.3d 183, 194 (4th Cir. 2019) ("The conditions, while no doubt frustrating and unpleasant to [plaintiff], cannot, from an objective perspective, be construed to leave her no choice but to resign.").

Seeking to avoid this conclusion, the Second Amended Complaint alleges that Plaintiff was required to have "significant, regular interaction with Holden, who remained one of the Defendant's three owners."[4] *Id.* ¶ 43. Plaintiff cites to cases where courts found plausible intolerability when plaintiffs were required to continue working with their alleged harassers. Dkt. 43 at 3–4. Each case offered by Plaintiff involves lewd and continuing sexual harassment resulting in an objectively intolerable environment.[5] Plaintiff makes no such allegations here. Rather, Plaintiff has failed to allege facts that plausibly demonstrate that she faced sex-based animus or an

---

[4] Plaintiff appears to add allegations outside of the four corners of the Second Amended Complaint, stating that "Holden wielded considerable power and autonomy over the projects on which Plaintiff worked during that time." Dkt. 43 at 3. This Court will not consider these additional allegations, as "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984); *see also Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) ("[Plaintiff] is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint."), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).

[5] *See Sunkins v. Hampton Roads Connector Partners*, 701 F. Supp. 3d 342 (E.D. Va. 2023) (finding plausible allegations where a plaintiff alleged that a coworker subjected her to sexual questions and advances, and that, after she reported the harassment to her supervisor, the supervisor asked her if she was interested in having sex with him and another female coworker); *Bailey v. Va. Dep't. of Alcoholic Beverage Control*, 2019 WL 123903, at *1 (E.D. Va. Jan. 7, 2019) (detailing how plaintiff's coworker touched her in a sexually suggestive manner several times despite objections from plaintiff.); *Dixon v. Boone Hall Farms, Inc.*, 2019 WL 6130472, at *1 (D.S.C. Nov. 19, 2019) ("[Plaintiff] claims to have been sexually assaulted on four different occasions by her co-worker . . . ."); *Lopez v. BMA Corp.*, 2013 WL 6844361, at *2 (D. Md. Dec. 24, 2013) ("The sexual harassment began on the first day [plaintiff] and [her harasser] started working together . . . . [Plaintiff] repeatedly rebuffed his advances, reminding him that she was only sixteen years old. This did not placate [her harasser] and the harassment continued as described.").

"environment imbued with insult and indignity." *Sunkins*, 701 F. Supp. 3d at 357. But, as discussed *supra*, the allegations regarding Holden's sex-based animus are conclusory and fail to plausibly allege such animus. Because the sexual harassment present in the cases cited by Plaintiff is distinguishable from the conduct that she alleges, Plaintiff fails to plausibly bridge the gap from unpleasant work conditions into objective intolerability.

In sum, Plaintiff's allegations fail to plausibly allege intolerability or anything beyond unpleasant or difficult working conditions. Moreover, Plaintiff provides only vague and conclusory facts when alleging bias by Holden or Anderson which fail to plausibly allege a causal link between their conduct and any gender-bias. Though Plaintiff was required to remain in contact with Holden after her transfer to a new position, the Complaint lacks the distinguishing characteristic of sexual harassment present in Plaintiff's cited authorities. Accordingly, the Court will grant the Motion to Dismiss on this theory of liability.

### B.   Retaliatory Constructive Discharge

Plaintiff also fails to provide sufficient facts to plausibly allege a claim of a retaliatory constructive discharge. Because she does not affirmatively allege that Holden was aware of her protected activities, a claim of retaliatory constructive discharge can only be premised on actions by Anderson. Accordingly, any claim premised on Anderson's actions fails because Plaintiff has not plausibly alleged that her environment was objectively intolerable. In support of her claim, Plaintiff cites a January 7, 2021 email from Anderson telling her "if you do not have time to do your job, or if you need me to help you prioritize, let me know." Dkt. 37 ¶ 41. Plaintiff describes this communication as chilling. *Id.* ¶ 45. As the Fourth Circuit recognizes, however, general characterizations of tone cannot be the basis for a constructive discharge claim. *Decoster v. Becerra*, 119 F.4th 332, 340 (4th Cir. 2024) (stating that plaintiff's claim that her supervisor "spoke

to her with contempt" and "treated her with disdain" were insufficient to allege a hostile work environment claim and therefore were unable to support a constructive discharge claim). In support of the claim that Anderson would respond to her questions in a hostile and toxic manner, Plaintiff alleges that he told her that "he had no time to supervise or support Plaintiff." Dkt. 37 ¶ 47. This description of Anderson's management style, while perhaps difficult or unpleasant, does not rise to the level of intolerability that would compel a reasonable person to resign. *Perkins*, 936 F.3d at 212 (citing *Williams v. Giant Food, Inc.*, 370 F.3d 423, 434 (4th Cir. 2004)). Again, the courts do not serve as a "super-personnel department." *Sharif*, 841 F.3d at 206.

Plaintiff also claims that Anderson's refusal to answer questions regarding the prioritization of projects left her "chaotically being whip-sawed between projects with competing deadlines." Dkt. 37 ¶ 47. Plaintiff then alleges that she was shunned and "given little productive work to do." *Id.* ¶ 51. Even taking these allegations as true (which the Court does and must), Plaintiff insufficiently pleads retaliatory constructive discharge. *See Munday v. Waste Mgmt. of N. Am.*, 126 F.3d 239, 243 (4th Cir. 1997) (finding that being ignored by supervisors and coworkers is insufficient evidence to establish a claim of constructive discharge); *see also Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985) (stating that employees are not guaranteed a work environment free of stress).

Plaintiff also contends that Defendant "'slow rolled' Plaintiff's harassment complaint, without effecting any remediation" and that the investigator's "serial interrogations" of Plaintiff were indicative of "Defendant brutally . . . targeting [her] with severe retribution . . . ." Dkt. 43 at 5; Dkt. 38 ¶ 49. Plaintiff's conclusory allegations regarding the retaliatory intent of Defendant are not borne out by her factual allegations. Here, Plaintiff alleges that: (i) Defendant hired an independent investigator who met with Plaintiff fifteen days after the complaint was lodged against

Holden, Dkt. 38 ¶¶ 25–28; and (ii) after Plaintiff submitted a signed statement on September 18, 2020, Anderson offered the option to transfer to a new role outside of Holden's supervision on October 20, 2020. *Id.* ¶¶ 29, 32. Plaintiff refuses to acknowledge this offer of transfer[6] as a remedial action. To be sure, the Fourth Circuit has "never suggested that an employer must make the most effective response possible." *Spicer v. Commw. of Va., Dep't of Corrections*, 66 F.3d 705, 710 (4th Cir. 1995) (*en banc*) (rebutting the district court's holding that defendant took no remedial action by indicating that dissatisfaction with defendant's response does not mean that no reasonable action was taken). Despite Plaintiff's allegations of serial interrogations, the investigator only met with Plaintiff for a second and third time after she renewed her complaint with Stephanie Reich in March of 2021. As this Court has previously recognized, it is the function of counsel "to investigate allegations of misconduct," which, by necessity, requires asking questions of the person making such allegations. *Cox v. Red Hat, Inc.*, 2025 WL 889888, at *15 (E.D. Va. Mar. 21, 2025). Other than the fact that Plaintiff was questioned on more than one occasion, Plaintiff alleges no facts supporting her assertion that such questioning was retaliatory.

Taken together, Plaintiff has not plausibly alleged facts indicating that a reasonable person in her position would have felt that they had no choice but to quit. Plaintiff does not allege that Holden was aware of her protected activities, and the allegations against Anderson are either characterizations of tone insufficient to support intolerability or vague and conclusory. Plaintiff

---

[6] The Court previously dismissed the "career-ending" theory of liability as alleged by Plaintiff with regards to the new role. *Martin v. Stateside Associates, Inc.*, 2025 WL 209816, at *6 (E.D. Va. Jan. 15, 2025). Plaintiff's Second Amended Complaint adds no new allegations in furtherance of the contention that her transfer of roles was "career-ending" and appears to admit in her Opposition that such an argument has no merit. Dkt. 43 at 4 ("Regardless of whether Plaintiff's reassignment to Anderson working on special projects was 'career-ending . . . .'"). Accordingly, the Court has dispensed with analysis relating to that theory of constructive discharge.

further contradicts herself regarding the amount of work she was being assigned, though either scenario fails to plausibly support her claim. *Compare* Dkt. 37 ¶ 47 (alleging she was "being whipsawed between projects with competing deadlines") *with* Dkt. 37 ¶ 51 (alleging she was ". . . given little productive work to do"). There are also no facts alleged indicating that Defendant's investigation into Plaintiff's internal complaint was retaliatory or so objectively intolerable as to compel Plaintiff to resign. Accordingly, the Motion will be granted.

IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendant Stateside Associates, Inc.'s Motion to Dismiss (Dkt. 40) is GRANTED; and it is

FURTHER ORDERED that Count V of the Second Amended Complaint is DISMISSED WITH PREJUDICE; and it is

FURTHER ORDERED that a Scheduling Order will issue promptly.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to all parties of record.

It is SO ORDERED.

Alexandria, Virginia
~~June~~ July 1, 2025

/s/
Rossie D. Alston, Jr.
United States District Judge