IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| MELISSA P. MARTIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:23-cv-01076 (RDA/IDD) |
| | ) | |
| STATESIDE ASSOCIATES, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

This matter comes before the Court on Defendant Stateside Associates, Inc.'s Motion for

Judgment on the Pleadings.  Dkt. 47.  This Court has dispensed with oral argument as it would not

aid in the decisional process.  *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J).  This matter has

been fully briefed and is now ripe for disposition.  Considering the Motion together with Plaintiff

Melissa P. Martin's Second Amended Complaint (Dkt. 38),[1] Defendant's Memorandum in Support

(Dkt. 48), Plaintiff's Opposition Brief (Dkt. 52), and Defendant's Reply Brief (Dkt. 53), this Court

GRANTS Defendant Stateside Associates, Inc.'s Motion for the reasons that follow.

---

[1] Plaintiff appears to have filed her original complaint *pro se*, although she was assisted by an attorney.  *See* Dkt. 1.  Before service of her complaint, however, Plaintiff retained her current counsel.  Dkt. 4 (seeking extension of time to serve the complaint because counsel was retained "late evening on November 14, 2023").  Subsequently, counsel has filed all docket entries on her behalf.

I.  BACKGROUND

A.  Factual Background[2]

On March 21, 2007, Plaintiff began her employment with Defendant as a Regulatory Counsel.  Dkt. 38 ¶ 13.  During the fourteen years that Plaintiff worked for Defendant, Plaintiff was consistently rated at least a successful performer and received significant annual performance-based bonuses.  *Id.*  In Summer 2019, Plaintiff was promoted to "Senior Director, Healthcare and Education Team" (the "Healthcare Team") and received a 16% increase in her salary.  *Id.* ¶ 14. Her new immediate supervisor was Robert Holden, one of Defendant's three Senior Principals. *Id.* ¶ 15.  In 2020, Plaintiff received a bonus for her job performance in that new role.  *Id.* ¶ 40.

In late 2019 and continuing into 2020, Plaintiff asserts that Holden began to seek Plaintiff's termination.  *Id.* ¶ 16.  Holden directed staffers not to work directly with Plaintiff and the Healthcare Team because it "would complicate matters."  *Id.*  In Winter 2020, Holden's subordinate, Zach Cook, a 30-year-old male, directed members of Holden's staff, none of whom were experienced, to check the Healthcare Team's work for "errors."  *Id.*  Plaintiff alleges that Holden's staff were not qualified to perform such review and that younger male managers were not subject to similar review.  *Id.* ¶ 17.

Plaintiff repeatedly informed Holden and Mark Anderson, a Senior Principal and the Co-Chief Executive Officer, that the Healthcare Team was understaffed, but her concerns were ignored.  *Id.* ¶¶ 19, 25.  The staffing problem grew exponentially worse after Defendant was engaged by Humana Corporation to perform healthcare-related regulatory and legislative work.

---

[2] For purposes of considering the instant Motion for Judgment on the Pleadings, the Court accepts all facts contained within the Complaint as true, as it must at the current stage.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

*Id.* ¶ 20.  In March 2020, Humana's demands increased dramatically with the onset of the COVID-19 pandemic.  *Id.* ¶ 21.

Plaintiff alleges that Holden, Cook, and other managers made unspecified demeaning remarks about female managers and staff.  *Id.* ¶ 18.  Plaintiff asserts that Cook derided Plaintiff's divorced status and her academic credentials.  *Id.*  Plaintiff alleges that Cook and the other unidentified male managers received multiple promotions that were denied to female staffers and that there was a "brutally toxic environment toward Plaintiff and other female staffers."  *Id.*  Further, Holden regularly lashed out at Plaintiff over operational matters related to the Healthcare Team.  *Id.* ¶ 23.  During these outbursts, Holden would scream and slam his fists onto office furniture.  *Id.*  Plaintiff asserts that Holden's outbursts were directed at Plaintiff and other female staffers, but not younger male staffers.  *Id.*  These interactions affected Plaintiff's mental and physical health.  *Id.* ¶ 24.  In 2020, Plaintiff sought treatment with a mental health provider.  *Id.*

On August 12, 2020, Plaintiff lodged a complaint with Defendant about Holden and the "abusive work environment that he was creating."  *Id.* ¶ 25.  In an August 20, 2020 meeting with Anderson, Plaintiff described the work environment in the Healthcare Team, as well as Holden's behavior.  *Id.* ¶ 26.  In response, Anderson initiated an internal investigation to be conducted by Meredith Campbell, Esq.  *Id.* ¶ 27.

On August 27, 2020, Plaintiff met with Campbell and described the abusive work environment stemming from "Holden's threatening behavior directed at her and other female staffers."  *Id.* ¶ 28.  Campbell assured Plaintiff that her interview would be confidential and that Defendant would not retaliate against her for the interview.  *Id.*

On September 18, 2020, Plaintiff provided a signed statement regarding her interview with Campbell.  *Id.* ¶ 29.  Two months passed without any noticeable action, and, on October 20, 2020,

Plaintiff sent Anderson an email informing him that she wanted to reach out to him about the issues she had raised with him. *Id.* ¶ 31. Anderson then agreed to meet with Plaintiff. *Id.*

On October 21, 2020, Anderson delivered "an ultimatum" to Plaintiff indicating that she could: (i) continue to work on the Healthcare Team as managed by Holden; or (ii) be moved off the Healthcare Team and be supervised by Anderson on special projects, over which Holden would not provide any supervisory authority. *Id.* ¶ 32. Anderson did not provide any further details about the proposed new position or special projects, but he did explain that Plaintiff would not have a team. *Id.* ¶ 33. Plaintiff alleges that she was alarmed by what she "reasonably viewed as retribution" for engaging in protected activities: the "choice" would make her either stay on the team with diminished job responsibilities as a result of the micro-management or accept an "amorphous and non-supervisory" role on projects where there were no specific job expectations or clear support system. *Id.*

On October 30, 2020, Plaintiff informed Anderson that she would accept the new position. *Id.* ¶ 34. Anderson told Plaintiff that her new title would be "Senior Director and Counsel, Policy Research." *Id.* Cook succeeded Plaintiff on the Healthcare Team, despite having no regulatory experience and having "dramatically less" managing experience compared to Plaintiff's "extensive leadership experience." *Id.* ¶ 35. After transferring to her new role, Plaintiff continued to be required to receive assignments from and report to Holden. *Id.* ¶ 43. Anderson and Holden assigned multiple healthcare-related special projects to Plaintiff. *Id.* ¶ 44. These projects required Plaintiff to once again interact with Holden several times a week, causing her emotional distress and interfering with her ability to do her job. *Id.* ¶ 46.

Anderson did not provide Plaintiff with specific guidance regarding the special projects on which she was to work. *Id.* ¶ 36. On November 30, 2020, Plaintiff sent Anderson an email

informing him of her handover to Cook and seeking direction regarding her new job duties.  *Id.*
¶ 37.  Anderson responded that same day with a list of projects that "we can transfer to you now."
*Id.*

On December 10, 2020, Anderson gave Plaintiff a list of performance goals for 2021 on special projects.  *Id.* ¶ 38.  On December 11, 2020, Anderson "excoriated" Plaintiff after she asked questions regarding a COVID-related project and accused her of erecting obstacles.  *Id.* ¶ 39.

Between November 2020 and April 2021, Anderson and Holden assigned Plaintiff to work on a number of special projects.  *Id.* ¶ 44.  At one point, Plaintiff informed Holden that she faced immediate deadlines for a competing project, to which Holden responded that his projects took priority.  *Id.*  Plaintiff informed Anderson of the conflicting deadlines via email.[3]  *Id.* ¶ 45.  In response, on January 7, 2021, Anderson faulted Plaintiff for not following her job description and wrote, "if you do not have time to do your job, or if you need me to help you prioritize, let me know."  *Id.* ¶ 41.  Anderson later continued to "badger" Plaintiff about not meeting Defendant's performance expectations.  *Id.* ¶ 42.

Plaintiff asserts that Anderson also refused to supervise or direct Plaintiff's work.  *Id.* ¶ 47.
Whenever Plaintiff sought guidance or provided updates on her assigned project, Anderson would respond in a hostile and toxic manner and explain that he had no time to supervise Plaintiff.  *Id.*
This led to Plaintiff being "whip-sawed between projects with competing deadlines."  *Id.*

---

[3] Plaintiff alleges in paragraph 41 of her Second Amended Complaint that Anderson's January 7, 2021 email stemmed from his "faulting her for not following an unwritten job description."  Dkt. 38 ¶ 41.  In paragraph 45, though, Plaintiff alleges that this email came in reply to informing Anderson of the conflicting deadlines.  *Id.* ¶ 45.  Because Plaintiff cites the same response from Anderson with regards to either context, this Court treats these allegations as a single criticism from Anderson.

In March 2021, Plaintiff expressed additional concerns about discrimination, harassment, and retaliation to Stephanie Reich, a Vice President. *Id.* ¶ 48. Plaintiff then met with Campbell and reiterated the same. *Id.* Plaintiff met with Campbell for a third time on March 16, 2021. *Id.* ¶ 49. Plaintiff asserts that not only was the complaint unresolved, she was "brutally target[ed] with severe retribution" by Defendant. *Id.* Although Plaintiff provided Campbell with the names of other employees who could corroborate Plaintiff's claims, Plaintiff alleges that Campbell did not interview them. *Id.* ¶ 50.

Plaintiff alleges that principals and coworkers shunned Plaintiff and that she was given little productive work to perform. *Id.* ¶ 51.

In Spring 2021, due to the "acute workplace-related mental distress that [Plaintiff] was experiencing," Plaintiff's mental health provider suggested that she resign from her employment with Defendant. *Id.* ¶ 53. On April 6, 2021, Plaintiff heeded that advice and resigned from the company, effective April 20, 2021. *Id.* ¶ 54. Plaintiff informed Defendant that, in her view, her resignation was involuntary, and that she was being constructively discharged. *Id.*

On May 27, 2021, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC"). *Id.* ¶ 6. On May 17, 2023, the EEOC issued a right to Sue Letter. *Id.* ¶ 7.

B.  Procedural Background

On August 15, 2023, Plaintiff filed her Complaint *pro se*. Dkt. 1. On November 15, 2023, current counsel made its first appearance on behalf of Plaintiff. Dkt. 3. Plaintiff then sought and was granted extra time to serve her Complaint. Dkt. 6. After serving Defendant, Plaintiff then sought leave to amend her Complaint. Dkts. 9–11. On March 4, 2024, leave to amend was granted, and Plaintiff filed her Amended Complaint. Dkts. 17–18.

On March 18, 2024, Defendant filed a Motion to Dismiss which sought to dismiss Counts IV–VIII of the Amended Complaint.  Dkts. 20–21.  Defendant also filed an Answer with affirmative defenses.  Dkt. 23.  After receiving additional time to respond to the motion, Plaintiff filed her Opposition Brief on April 5, 2024, stipulating to the dismissal of Counts IV–VI as well as Counts VII–VIII insofar as they relied on claims of age-based discrimination.  Dkt. 27.  Defendant then filed its Reply.  Dkt. 28.

After the Motion was fully briefed, Plaintiff moved for leave to file a second amended complaint.  Dkt. 29.  Defendant moved to strike.  Dkt. 31.  Plaintiff then withdrew her motion.  Dkt. 32.  On May 8, 2024, Plaintiff filed a notice of supplemental authority.  Dkts. 33–34.  On May 16, 2024, Defendant filed a response.  Dkt. 35.

On January 15, 2025, the Court issued a Memorandum Opinion and Order granting Defendant's Motion to Dismiss.  Dkt. 36.  The Court dismissed Counts IV, V, VI, and Count VII to the extent that they relied on age discrimination pursuant to Plaintiff's stipulation. Dkt. 36.  Count VIII, which asserted a Title VII constructive discharge, was dismissed for failure to state a claim.  *Id*.  In so holding, the Court noted that Plaintiff did not identify whether she was asserting a retaliatory or gender-based constructive discharge, but found that, in either event, Plaintiff failed to state a claim.  *Id.*  Importantly, the Court specifically noted that Plaintiff failed to allege that "Anderson had any gender-based bias." *Id.* at 8.  The Court further held that Plaintiff's allegations regarding demotion and retaliation were not so intolerable as to establish a constructive discharge. *Id.* at 10.

With leave of the Court, Plaintiff filed a Second Amended Complaint on January 29, 2025.  Dkt. 38.  On February 12, 2025, Defendant filed a Motion to Dismiss Count V of the Second Amended Complaint, which alleges constructive discharge.  Dkt. 40.  Defendant also filed an

Answer with affirmative defenses.  Dkt. 39.  Plaintiff filed an Opposition on February 26, 2025. Dkt. 43.  Defendant filed its Reply on March 4, 2025.  Dkt. 44.  On July 1, 2025, the Court issued a Memorandum Opinion and Order granting Defendant's Partial Motion to Dismiss.  Dkt. 45.  The Court dismissed Plaintiff's constructive discharge claim, Count V of the Second Amended Complaint, with prejudice.  *Id.*  In so holding, the Court found that: (i) "Plaintiff proffers no factual allegations plausibly indicating gender bias by Holden"; (ii) "Plaintiff provides only vague and conclusory facts when alleging bias by Holden or Anderson which fail to plausibly allege a causal link between their conduct and any gender bias"; (iii) Plaintiff failed to allege that "Holden was aware of her protected activities"; and (iv) Plaintiff failed to "plausibly allege[] that her environment was objectively intolerable."  *Id.*

On July 16, 2025, Defendant filed Motion for Judgment on the Pleadings and Memorandum in Support of Motion for Judgment.  Dkts. 47–48.  Plaintiff filed her Memorandum in Opposition on July 30, 2025.  Dkt. 52.  Defendant filed its Reply on August 1, 2025.  Dkt. 53.

## II.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Nonetheless, the standard of review for Rule 12(c) motions is the same "plausibility standard" that governs Rule 12(b)(6) motions.  *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014); *Travelers Indem. Co. of Connecticut v. Lessard Design, Inc.*, 321 F. Supp. 3d 631, 635 (E.D. Va. 2018).  "A Rule 12(c) motion for judgment on the pleadings is appropriate when all material allegations of fact are admitted in the pleadings and only questions of law remain."  *Wells Fargo Equip. Fin., Inc. v. State Farm Fire & Cas. Co.*, 805 F. Supp. 2d 213, 216 (E.D. Va. 2011) (quoting *Republic Ins. Co. v. Culbertson*, 717 F. Supp. 415, 418 (E.D. Va. 1989)), *aff'd*, 494 F. App'x 394 (4th Cir. 2012).

8

A motion for judgment on the pleadings challenges a claim's sufficiency, "it does not resolve disputes over factual issues, the merits of a claim, or the applicability of a defense." *SunTrust Mortg., Inc. v. Simmons First Nat'l Bank*, 861 F. Supp. 2d 733, 735 (E.D. Va. 2012) (citing *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)).  Thus, "judgment should be entered when the pleadings, construing the facts in the light most favorable to the non-moving party, fail to state any cognizable claim for relief[.]"  *O'Ryan v. Dehler Mfg. Co.*, 99 F. Supp. 2d 714, 718 (E.D. Va. 2000).

### III.  ANALYSIS

Here, Defendant seeks judgment on the pleadings as to the remaining four causes of action that Plaintiff asserts under Title VII of the Civil Rights Act of 1964 in the Second Amended Complaint.  Dkt. 48.  For the reasons set forth below, the Court will grant the Motion.

### A.  Count I: Gender Discrimination Under Title VII

Title VII prohibits an employer from discriminating against "any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2.  Where, as here, a plaintiff does not rely on direct evidence of discrimination, she needs to allege facts that plausibly support inferences of the elements of her discrimination claim, which typically involves asserting the elements of a *prima facie* case of discrimination: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class."  *Coleman v. Maryland Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (citing *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir.2004)), *aff'd sub nom. Coleman v. Ct. of Appeals of Maryland*, 566 U.S. 30 (2012).  Ultimately, to survive a motion for judgment on the pleadings, Plaintiff must allege facts sufficient

to establish a reasonable inference of discrimination.  *See Ali v. BC Architects Eng'rs, PLC*, 832 F. App'x 167, 171 (4th Cir. 2020) (discussing whether allegations are sufficient to support a reasonable inference of discrimination sufficient to support a motion to dismiss).  Here, Plaintiff's allegations fall short.

To begin with, Plaintiff fails to allege sufficient facts to show that she suffered from an adverse employment action.  Plaintiff premises her discrimination claim, in part, on her alleged "constructive discharge."  Dkt. 38 ¶ 63.  But this Court has already determined that Plaintiff did not sufficiently allege a constructive discharge claim.  *See generally* Dkt. 45.  Thus, although Plaintiff may view her resignation as involuntary, it does not constitute an adverse employment action for purposes of this suit.  Dkt. 38 ¶ 54.  To the extent that Plaintiff attempts to rely on other alleged adverse employment actions, those allegations likewise fail to plausibly support that Plaintiff was subjected to such an adverse action.  First, Plaintiff's attempt to frame her decision to transfer to a position under Anderson as a demotion fails because as has been recognized , where plaintiffs make a choice, the resulting action is "not the result of a deliberate decision" by the employer and, thus, not an adverse employment action.  *See, e.g.*, *Turley v. SCI of Ala.*, 190 F. App'x 844, 846 (11th Cir. 2006); *Blake v. Potter*, 247 F. App'x 673, 676 (6th Cir. 2007) (holding no adverse employment action where denial of requested shift "resulted in her own choice to take unpaid leave rather than work her assigned shift").  Second, although Plaintiff lists a litany of actions in her Second Amended Complaint, Plaintiff has failed to plausibly assert that such conduct changed the terms and conditions of her employment as required to state a plausible adverse employment action.  Dkt. 38 ¶ 63 (listing the following adverse employment actions: demeaning her work contributions, subjecting her to repeated interrogations about her complaints, ostracizing Plaintiff from her coworkers).  For example, Plaintiff's complaints regarding the handling of her

10

discrimination complaints and interrogation do not appear to alter the terms and conditions of her employment. Other allegations of adverse actions, namely the hostile work environment, are separately accounted for in other counts and cannot separately support a discrete claim of discrimination. *Compare* Dkt. 38 ¶ 63 (incorporating hostile work environment into discrimination claim), *with id.* ¶¶ 79-94 (asserting claims of hostile work environment).[4] The Court notes that it has considered the Supreme Court's decision in *Muldrow v. City of St. Louis, Mo.*, 601 U.S. 346 (2024), and does not find that it changes the calculus with respect to an adverse employment action when the plaintiff chooses a transfer. Moreover, *Muldrow* continues to require that an adverse employment action change the terms or conditions of a plaintiff's employment. 601 U.S. at 359. Thus, Plaintiff has failed to plausibly allege that she suffered an adverse employment action.

The Court further finds that Plaintiff fails to satisfy the fourth element of the *prima facie* case. The fourth element requires Plaintiff to "provide evidence that the proposed comparators are not just similar in *some* respects, but 'similarly-situated *in all* respects.'" *Spencer v. Va. State Univ.*, 919 F.3d 199, 207-08 (4th Cir. 2019) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). Although a plaintiff is not required to rely on similarly situated comparators, where a plaintiff does so rely, that plaintiff must meet this standard. Here, Plaintiff has chosen to proceed by relying on comparators to establish a plausible inference of discrimination. "To that end, [P]laintiff must prove that she and the comparator 'dealt with the same supervisor, were subject to the same standards[,] and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them

---

[4] Indeed, Plaintiff's allegations of a hostile work environment bleed into each of Plaintiff's separate legal theories and claims. But a claim of disparate treatment is a separate legal theory from a claim of hostile work environment.

for it.'" *Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707, 714 (4th Cir. 2024) (quoting *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019)).

Plaintiff's Second Amended Complaint appears to allege four instances of disparate treatment from similarly situated employees outside her protected class. Specifically, Plaintiff asserts that Holden asked less experienced staff to check Plaintiff's work for errors, while male coworkers were not subject to similar review. Dkt. 38 ¶¶ 16-17. In addition, male staffers on Holden's team received multiple promotions while female staff were denied these opportunities. *Id.* ¶ 18. Plaintiff also alleges that Holden regularly lashed out at Plaintiff over operational matters related to the Healthcare team, and the outbursts were directed at her and other female staff but not towards male coworkers. *Id.* ¶ 23. Lastly, Plaintiff asserts that Plaintiff's successor of her original team would be Cook, who had no or "dramatically less" experience compared to Plaintiff. *Id.* ¶ 35.

The Court finds that Plaintiff's factual allegations fail to show that Plaintiff was "similarly-situated in all respects" with her male coworkers. Even though Plaintiff asserts that the male coworkers were not being similarly supervised as her, the Second Amended Complaint is devoid of any specific allegation describing the context of such supervision, making it impossible for the Court to infer that the male co-workers were similarly-situated to Plaintiff in all material respects. Indeed, other than Cook, these male co-workers are not even identified. Plaintiff also fails to specify whether the females who were the targets of the outbursts or were denied the promotions had similar responsibilities or skills as their male coworkers. *See Gordon v. Maryland State Police*, 2023 WL 6161089, at *7 (D. Md. Sept. 21, 2023) (dismissing discrimination claim where plaintiffs did not offer the identities of any comparators, their experience level, or any particular skills). The Second Amended Complaint thus does not plead sufficient facts allow the Court to determine

whether these coworkers were similarly situated, let alone in all material respects. Even though Plaintiff alleges that her successor, Cook, was less experienced than Plaintiff, Plaintiff was not similarly-situated to Cook because Plaintiff and Cook were not competing for the same position at the same time. Cook took over the position only after Plaintiff left it. Consequently, Plaintiff has not alleged facts sufficient to satisfy the fourth element of her claim.

Most importantly, to the extent that Plaintiff attempts to rely on purported gender-based animus by Holden and/or Anderson to support an inference of discrimination, Plaintiff fails to persuade. This Court has previously held that "Plaintiff has failed to allege facts that plausibly demonstrate that she faced sex-based animus." Dkt. 45 at 11; *see also id.* at 9, 10, 12. Plaintiff fails to address the analytical framework of this Court's prior Memorandum Opinion and Order. Rather, Plaintiff relies on four paragraphs of her Second Amended Complaint to support her contention that "Defendant acted with gender bias." Dkt. 52 at 3 (citing Dkt. 38 ¶¶ 15, 44, 51, 63).[5] None of the paragraphs referenced by Plaintiff solve the deficit in plausible allegations of animus previously identified by the Court. In short, Plaintiff fails to assert sufficient factual allegations to support an inference that any conduct by Defendant (through Holden, Campbell, or

---

[5] In this regard, Plaintiff makes the argument that, "[i]rrespective of whether Ms. Martin, in the SA, alleged that the co-owners, Holden and Anderson, individually harbored animus, she has alleged that the company that they owned and controlled . . . , Stateside Associates, engaged in unlawful discrimination." Dkt. 3. But an entity – like Defendant Stateside Associates – can only act through people, which Plaintiff acknowledges when she then argues that "Holden and Anderson, as owners, held Stateside positions that indisputably were within that class of an employer's organization's officials who may be treated as the organization's proxy." *Id.* (cleaned up) (citation omitted). Thus, pursuant to Plaintiff's own argument, Defendant can only discriminate where persons whose behavior is imputable to it engage in discrimination. Holden's and Anderson's conduct are imputable to Defendant, but Plaintiff has failed to allege facts supporting the second step of that analysis – that they discriminated based on sex. Where Plaintiff has failed to allege facts which plausibly support that Holden and Anderson acted on the basis of her sex, then it follows that Plaintiff cannot establish an inference of discrimination with respect to her claim against Defendant.

Andersons) was based on her sex.  In Paragraph 15, Plaintiff merely recites her expertise and Holden's position as her supervisor. Dkt. 38 ¶ 15.  In Paragraph 44, Plaintiff describes a dispute between herself and Holden regarding prioritization of work.  *Id.* ¶ 44.  Paragraph 51 appears to relate not to claims of gender-based discrimination, but to claims of retaliation.  *Id.* ¶ 51 (alleging that, "*[a]fter* Plaintiff initiated her harassment complaint," Plaintiff was shunned and her work diminished (emphasis added)).  Finally, Paragraph 63 is conclusory insofar as it attempts to assert sex-based discrimination and simply asserts without factual support that "Defendant took a series of discriminatory adverse actions toward Plaintiff because of her gender."  *Id.* ¶ 63; *see  Bass v. E.I. DuPont de Nemours & Co*., 324 F.3d 761, 765 (4th Cir. 2003) (holding that conclusory allegations that the employer discriminated against the plaintiff "because of her race and sex" were not sufficient to allege a claim when the facts of the complaint did not support the conclusory allegation); *Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 142 (4th Cir. 2007) (conclusory statements that plaintiff was treated differently because of race and "generalized statements of dissimilar treatment" insufficient to show discrimination based on race); *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 281 (4th Cir.2000) (bare allegation that supervisor "did not subject any of [plaintiff's] white peers to similarly poor treatment" did not show the treatment "was due to race rather than [the supervisor's] admittedly low regard for [plaintiff's] individual performance"); *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998) (allegations of ill treatment at the hands of supervisors insufficient to make out hostile work environment claim where supervisor "never made any derogatory comments about [plaintiff's] race or age, and nothing about his conduct suggests it was based on these factors").  Thus, none of the paragraphs cited by Plaintiff contradict this Court's prior holding nor do they raise a plausible inference of discrimination and

Plaintiff cites no other paragraphs of her Second Amended Complaint in support of her allegations.[6]

Because Plaintiff has not satisfied all of the required elements for making this claim, Plaintiff's allegations fails to plausibly allege facts sufficient to either support a *prima facie* case of gender discrimination or support a reasonable inference of gender discrimination. Accordingly, the Motion will be granted in this regard.

### B.   Count II: Retaliation

To state a *prima facie* case of retaliation under Title VII, a plaintiff must sufficiently allege "(1) that [s]he engaged in protected activity, (2) that the employer took a materially adverse action against [her][,] and (3) there is a causal connection between the protected activity and the adverse action." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 195 (4th Cir. 2019) (internal citations omitted). In the Title VII retaliation context, a materially adverse action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 63 (2006). The resulting harm must be a "*significant detriment*" to the plaintiff and not "relatively insubstantial or trivial." *Laird v. Fairfax Cnty., Virginia*, 978 F.3d 887, 893 (4th Cir. 2020) (quoting *Burlington N.*, 548 U.S. at 68) (emphasis in original). Typically, "[a]n adverse action is one that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington Indus., Inc v. Ellerth*, 524 U.S. 742, 761 (1998)). Again, Plaintiff fails to meet this standard and to plausibly allege retaliation.

---

[6] Nor has Plaintiff sought reconsideration of any of the Court's prior determinations.

Taking all facts alleged in the Second Amended Complaint as true, Plaintiff engaged in a protected activity when she lodged a complaint with Defendant on August 12, 2020, and met with Anderson to discuss the details of her allegations about the work environment and her supervisor Holden's behavior on August 20, 2020. Dkt 38. ¶¶ 25, 27; *Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012) (holding that "an employee's complaint constitutes protected activity when the employer understood, or should have understood, that the plaintiff was opposing discriminatory conduct"). Plaintiff alleges that after filing the complaint, she was subsequently interviewed by Campbell for an internal investigation initiated by Anderson. Dkt 38. ¶ 27. During the meeting with Campbell on August 27, 2020, Plaintiff described in detail the harassment that she alleges she faced. *Id*. ¶ 28. Plaintiff subsequently submitted a signed statement on September 18, 2020. *Id.* ¶ 29. Then, in March 2021, Plaintiff expressed further concerns regarding harassment. *Id.* ¶ 48.

This Court previously addressed Plaintiff's claims of retaliation in the context of a retaliatory constructive discharge. Dkt. 45. In so holding, the Court recognized that Plaintiff did "not allege that Holden was aware of her protected activities." Dkt. 45 at 14. Absent such knowledge, Plaintiff cannot rely on any action by Holden to support her retaliation claim. *See, e.g.*, *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 125 (4th Cir. 2021) (holding "we conclude that Fourth Circuit precedent addressing the causation prong of a *prima facie* case of retaliation requires that a plaintiff demonstrate that the decisionmaker imposing the adverse action have actual knowledge of the protected activity"). Although Plaintiff attempts to dispute the Court's holding here, Dkt. 52 at 4 n.1, once again Plaintiff points to no specific allegation indicating that Holden knew of Plaintiff's protected activities. Rather, Plaintiff simply asserts that knowledge is imputed to him. *Id.* Although certain conduct and knowledge may be imputed to *Defendant* for purposes

16

of liability, for purposes of establishing that any individual retaliated in response to a protected activity, there was must a reasonable inference that such individual *actually knew* of the protected activity. *See Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 125 (4th Cir. 2021) (holding "Fourth Circuit precedent addressing the causation prong of a *prima facie* case of retaliation requires that the plaintiff demonstrate that the decisionmaker imposing the adverse action have actual knowledge of the protected activity"). Here, Plaintiff does not allege or argue such knowledge and, thus, cannot premise any retaliation claim on conduct by Holden.[7]

Thus, in analyzing the retaliation claim, the Court can only look to the acts of those alleged to have knowledge: Anderson and Campbell. Moreover, a retaliation claim can only be premised on those acts that come *after* a plaintiff engages in a protected activity. *See Kelly v. Town of Abingdon*, 558 F.3d 289, 304 (W.D. Va. 2021) (finding no retaliation where the decisionmakers "treated [the plaintiff] poorly before he filed his EEOC charges, and they continued to treat him poorly after he filed his charges"). Thus, to the extent that Plaintiff's retaliation claim is premised on poor treatment that she experienced both before and after her protected activities, those allegations cannot support a plausible retaliation claim.

With respect to acts by Anderson and Campbell, the Court previously found: (i) that "Plaintiff further contradict[ed] herself regarding the amount of work she was being assigned, though either scenario fails to plausibly support her claim"; (ii) that there were "no facts alleged

---

[7] In any event, any inference of causation to support a retaliation claim based on conduct by Holden, is undermined by the fact that Plaintiff alleges that Holden engaged in the same conduct both before and after she engaged in any protected activity. *See* Dkt. 38 ¶ 23 (alleging "Holden regularly lashed out" prior to any protected activity); *see also Mehta v. Potter*, 2009 WL 1598403, at *11 (E.D. Va. June 4, 2009) ("Because adverse actions had been taken against [plaintiff] before the filing of her EEOC complaint, one cannot infer retaliatory animus from the other similar, adverse employment actions taken against her over a year after the filing of the EEOC complaint.").

indicating that Defendant's investigation into Plaintiff's internal complaints was retaliatory"; and (iii) that "the allegations against Anderson are either characterizations of tone . . . or vague and conclusory." Dkt. 45 at 14-15. Again, Plaintiff does not address this Court's prior Memorandum Opinion and Order (nor does she request reconsideration of this Court's prior holdings). Indeed, instead of addressing this Court's prior Opinion, Plaintiff relies on the same conclusory arguments that cloak her conclusory Second Amended Complaint. Dkt. 52 at 4 ("Ms. Martin has alleged that Defendant[] deployed a sustained, vicious harassment campaign against her after she complained of unlawful harassment, a campaign that terrorized her and would give any reasonable employee pause about complaining about actions actionable under Title VII."). But without factual support, such allegations run afoul of the pleading standards announced in *Twombly* and *Iqbal*. Thus, Plaintiff has failed to state a claim and that judgment on the pleadings is appropriate with respect to her retaliation claim.

Nonetheless, the Court will address the arguments with respect to Plaintiff's retaliation claim in more detail. With respect to Plaintiff's alleged demotion, the Court disagrees with Plaintiff that she experienced a material change in employment status when Defendant offered a choice between two positions, which included the position she currently held. Courts of appeals have recognized that, where plaintiffs make a choice, the resulting action is "not the result of a deliberate decision" by the employer and, thus, not an adverse employment action. *See, e.g.*, *Turley v. SCI*, 190 F. App'x 844, 846 (11th Cir. 2006); *Blake v. Potter*, 247 F. App'x 673, 676 (6th Cir. 2007) (holding no adverse employment action where denial of requested shift "resulted in her own choice to take unpaid leave rather than work her assigned shift"). This is not a case where an employee was given a choice of resigning or accepting a transfer, but a case where an employee was given the option of continuing to stay in her current supervisory role or switch.

18

Furthermore, Plaintiff alleges that after her transfer, Anderson failed to supervisor her and then criticized her work.  Dkt. 38 ¶¶ 41, 47.  Even though Plaintiff perceived Anderson's communication style as difficult or unpleasant, workplaces are not always harmonious, and the Fourth Circuit has made clear that employment laws are not intended to govern minor workplace disagreements or personality conflicts between coworkers.  *See E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008); *see also Mustafa v. Iancu*, 313 F. Supp. 3d 684, 695 (E.D. Va. 2018) ("Title VII does not create a general civility code in the workplace.") (quoting *Mosby-Grant v. City of Hagerstown*, 630 F.3d 326, 335 (4th Cir. 2010)).  Courts do not serve as a "super-personnel department weighing the prudence of employment decisions" or practices.  *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 206 (4th Cir. 2016).  The difficulties of weighing competing priorities and attempting to follow perhaps unclear directions are not the kinds of conduct that constitute *material* adverse actions.  Courts have long-recognized that such claims that essentially allege a failure to supervise effectively fail to establish a material adverse action.  *See Booth v. County Executive*, 186 F. Supp. 3d 479, 488 (D. Md. 2016) (rejecting retaliation claim based on "delayed supervision sessions," failures to "sign off on necessary forms," and verbal embarrassment in front of coworkers).  Each of Plaintiff's complaints regarding Anderson relate back to his management style, her contradictory claims of having too much/not enough work, and criticisms that he gave regarding her work.  There is no connection to her protected activities and Plaintiff often fails to allege the dates on which any of these events are alleged to occur.[8]

---

[8] It appears that Plaintiff's complaints regarding Anderson's "censure" in January 2021 came months after her last protected activity in September 2020, such that it falls outside the time period that the Fourth Circuit generally considers supportive of an inference of causation.  *See Roberts*, 998 F.3d at 127 (noting that a "period of longer than two months between the protected activity and the adverse action 'significantly weakens the inference of causation'").

Lastly, Plaintiff's conclusory allegation regarding the retaliatory intent of Defendant is not borne out by her assertion of Campbell's three-time interview with her. As this Court has recognized, it is the function of counsel, here Campbell, "to investigate allegations of misconduct," which, by necessity, requires asking questions of the person making such allegation. *Cox v. Red Hat, Inc.*, 2025 WL 889888, at *15 (E.D. Va. Mar. 21, 2025). Other than alleging that Campbell "grilled" Plaintiff three times for her complaint, Plaintiff fails to state a plausible retaliatory action of Defendant. Moreover, to the extent Plaintiff premises her retaliation claim on the failure to take action with respect to her claims, the Fourth Circuit has held that a claim of "inaction" is insufficient to establish retaliation. *Cooper v. Smithfield Packaging Co., Inc.*, 724 F. App'x 197, 202 (4th Cir. 2018) ("Cooper, by contrast, alleges inaction, on the part of Smithfield. . . . This claim, too, was properly dismissed.").[9]

In short, with respect to her retaliation claim, Plaintiff both fails to allege an adverse action and fails to allege facts sufficient to establish either that she suffered an adverse action or that there is a causal connection between any protected activity and any alleged "adverse action." Thus, Plaintiff fails to plausibly state a claim for retaliation and the Motion will be granted in this regard.

### C. Counts III and IV: Hostile Work Environment

Turning to Plaintiff's hostile and retaliatory work environment claims, the Court finds that Plaintiff fails to allege sufficient facts to establish the claims. "[P]laintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). For such a claim to be viable, the Complaint must plausibly allege facts showing that the workplace is "permeated with

---

[9] Again, because Plaintiff failed to sufficiently allege facts supporting a constructive discharge, Plaintiff cannot rely on her resignation as an adverse action.

'discriminatory intimidation, ridicule, and insult'" which "would reasonably be perceived, and is perceived, as hostile or abusive." *Harris v. Forklift Sys.*, 510 U.S. 17, 21–22 (1993) (quoting *Meritor*, 477 U.S. at 65, 67). To meet this standard, Plaintiff "must offer facts that plausibly support inferences that 'she was subjected to (1) unwelcome conduct, (2) based on her . . . sex, that was (3) severe or pervasive enough to make her work environment hostile or abusive and (4) imputable to . . . her employer.'" *Laurent-Workman v. Wormuth*, 54 F.4th 201, 210 (4th Cir. 2022) (quoting *Bazemore v. Best Buy*, 957 F.3d 195, 200 (4th Cir. 2020)). Likewise, to state a retaliatory hostile work environment claim, a plaintiff must allege "that the retaliatory conduct (1) was unwelcome, (2) was sufficiently severe or pervasive that it would dissuade a reasonable worker form making or supporting a charge of discrimination, and (3) can be attributed to an employer." *Id.* at 218.

To plead that unwelcome conduct was based on sex, a plaintiff must allege "that her protected characteristics under Title VII was the 'but for' cause of the alleged harassment." *Laurent-Workman*, 54 F.4th at 210. In other words, a plaintiff must show that she would not have been subjected to harassment, if not for her sex. For example, harassment which includes "explicit and derogatory references to women" is sufficient to establish but-for causation. *Miller v. Washington Workplace, Inc.*, 298 F. Supp. 2d 364, 374 (E.D. Va. 2004) (quoting *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242 (4th Cir. 2000)) (finding sufficient basis in sex where the defendant commented on plaintiff's breasts and asked her about her sex life); *cf. Engler v. Harris Corp.*, 2012 WL 3745710, at *5 (D. Md. Aug. 28, 2012) (finding an insufficient basis in sex for conclusory allegations that male employees made hostile and rude remarks). As this Court previously recognized, Plaintiff fails to allege facts sufficient to connect any of the conduct of which she complains to her sex or gender or to demonstrate that the alleged harassment from which

she suffered was severe or pervasive. Dkt. 45 at 9–12. Plaintiff's allegations here fail for the same reason.

Attempting to establish Holden's gender-bias, Plaintiff alleges that Holden empowered Cook to make "demeaning remarks about female managers and staff" and that Cook continually derided Plaintiff's divorced status and her academic credentials. Dkt. 38 ¶ 18. However, as the Court previously determined, these alleged insults, while deplorable if true, are not unambiguously gender-based. Dkt. 45 at 9. Even though Plaintiff contends that similar comments were not directed at male managers and staff, comparing the lack of similar treatment of coworkers alone is insufficient to establish a plausible basis for believing sex was the true basis for Cook's remarks, especially when Plaintiff fails to allege whether those male staffers were divorced or had similar credentials. *See Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 772 (4th Cir. 1997) ("An insulting or demeaning remark does not create a federal cause of action for sexual harassment merely because the 'victim' of the remark happens to belong to a class protected by Title VII.").

Plaintiff also alleges that Cook directed Holden's staff to check Plaintiff's work for errors despite the lack of experience of the staff and that male coworkers were not supervised. Dkt. 38 ¶¶ 16-17. However, courts have held that alleged nitpicking, micromanaging, unfavorable job assignments, and pretextual write-ups are insufficient to create a hostile work environment. *See, e.g.*, *Guillen v. Esper*, 2020 WL 3965007, at *14 (E.D. Va. July 13, 2017) (finding that plaintiff's allegations of "nitpicking," personality conflicts, disliked assignments, and generalized workplace grievances could not establish that the issues were based on plaintiff's protected characteristic and were not enough to state a hostile work environment claim). Accordingly, Plaintiff's allegations fail to provide a plausible factual basis that the alleged nitpicking and micromanaging are the result of her protected characteristic. Likewise, as the Court previously determined, Plaintiff's

allegations regarding her interactions with Holden after her transfer appear to relate to the prioritization of the work rather than relate to any sex-based animus. Dkt. 45 at 10.

In addition, allegations regarding under-staffing fail to connect back to Plaintiff's sex. Dkt. 38 ¶¶ 19–20. Plaintiff's allegations that Holden directed at Plaintiff and other female staffers, but not younger male staffers are vague and conclusory and incapable of supporting a plausible claim without details as to the substance of Holden's outbursts. *See Buchhagen v. ICF Int'l Inc.*, 545 F. App'x 217, 219 (4th Cir. 2013) (dismissing Plaintiff's hostile work environment claim because allegations of supervisor mockingly yelling at Plaintiff in one meeting, yelling and pounding her hands on desk in another meeting, harping on mistakes, unfairly criticizing Plaintiff, making snide comments, and playing favorites with employees fall "far short of being severe or pervasive enough to establish an abusive environment"). Indeed, Plaintiff does not even allege the basis for her knowledge that Holden yelled at her, but not male staffers, nor does she allege sufficient facts to establish that these male staffers were similarly situated to Plaintiff. In fact, these allegations appear to be more expressly related to the "operation matters" in her team and the increasing demands from Defendant's client.

To the extent that Plaintiff premises her hostile work environment claim on the alleged yelling by Holden, Plaintiff's allegations are entirely conclusory. Plaintiff alleges no facts about the frequency of the alleged yelling or the content of the statements to support her claim of hostile work environment. *See Steele v. Blinken*, 2022 WL 11964563, at *6 (E.D. VA. Oct. 19, 2022) (dismissing claim where plaintiff failed "to plead at least modest details that would allow the Court to assess the frequency and severity of allegedly harassing conduct"). As the Fourth Circuit has repeatedly instructed, plaintiffs must "clear a high bar" in order to satisfy this test, holding that

complaints premised on "rude treatment" or "callous behavior" are not actionable.  *E.E.O.C. v. Sunbelt Rentals. Inc.*, 521 F.3d 306, 316 (4th Cir. 2008).

In addition, Plaintiff asserts that after expressing her continued concerns about discrimination to one of Defendant's Vice Presidents, Campbell interviewed her twice, but that Campbell did not interview employees who would corroborate Plaintiff's claims.  Dkt. 38 ¶¶ 48–50.  Plaintiff alleges that the complaint remained unresolved, and that she was targeted by Defendant with severe retribution for filing her complaint, including a lack of work and shunning by her co-workers.  *Id.* ¶ 49.  However, Plaintiff failed to allege facts to specify how she was "targeted for severe retribution," and the shunning of colleagues and unsatisfactory work assignment do not clear the high bar needed to meet the "severe or pervasive element."  *Roesinger v. Pohanka of Salisbury, Inc.*, 2024 WL 701776, at *3 (4th Cir. Feb. 21, 2024) ("Undesirable work assignments, a boss who plays favorites and criticizes one's work, colleagues who give the cold shoulder, and 'the sporadic use of abusive language' are 'ordinary tribulations of the workplace' that, while unfair and hurtful, do not implicate Title VII.").  Accordingly, Plaintiff has failed to establish either a sex-based or a retaliatory hostile work environment claim.

## IV.  CONCLUSION

In sum, Plaintiff has failed to allege sufficient facts to establish a basis for claims of gender discrimination, retaliation, hostile or retaliatory work environment.  Thus, pursuant to Rule 12(c), Defendant will be entitled to judgment on the pleadings for Count I, Count II, Count III, and Count IV.  Accordingly, for the foregoing reasons, it is hereby

ORDERED that Defendant's Motion for Judgment on the Pleadings (Dkt. 47) is GRANTED; and it is

FURTHER ORDERED that the Clerk of the Court is DIRECTED to enter Rule 58 judgment in favor of Defendant and against Plaintiff and to place this matter among the ended causes.

It is SO ORDERED.

Alexandria, Virginia
March 5, 2026

_____ /s/

Rossie D. Alston, Jr.
United States District Judge